# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**SHERRIE KAW,**

        **Plaintiff,**

**vs.**                         **CASE NO: 8:07-cv-02222-T-33TGW**

**SCHOOL DISTRICT OF
HILLSBOROUGH COUNTY,**

        **Defendant**

_____/

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW

The Defendant, the School District of Hillsborough County ("District") by and through its undersigned counsel, moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for Summary Judgment, on the grounds that no genuine issue of material fact exists as to the claims pled in the complaint and the District is entitled to judgment as a matter of law. In support of this motion, the District submits the following memorandum of law.

## MEMORANDUM

The Plaintiff's amended complaint consists of three counts brought under the American with Disabilities Act ("ADA"), 42 U.S.C. §12117, Section 504 of the Rehabilitation Act of 1973 ("504"), 29 U.S.C. §794 and the Florida Civil Rights Act ("FCRA"), §760.11 Fla. Stat. "Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases" and "[c]ases decided under the

Rehabilitation Act are precedent for cases under the ADA, and vice versa." Cash v. Smith, 231 F.3d 1301, 1305 and n. 2 (11th Cir. 2000)(citing 29 U.S.C. § 794(d); Pritchard v. Southern Co. Servs., 92 F.3d 1130, 1132 n. 2 (11th Cir.1996)).   Additionally, the claims arising under the FCRA are also analyzed under the same framework.   Chanda v. Engelhard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000).

## STATEMENT OF FACTS[1]

The Plaintiff was employed by the District as a one-on-one aide to serve the needs of exceptional student, B.V., at Benito Middle School.[2]   She was hired in the summer of 2005 and was terminated on October 5, 2006.   As a one-on-one aide, the Plaintiff was responsible for the safety, security and functioning of B.V.   (Kenny 29-31; Smith 79)  This position is a temporary, non-permanent position, created solely for purposes of meeting the needs of B.V., as defined by his Individual Education Plan (IEP).   (Smith 23, 79-80)  The position is not covered by either of the District's employee bargaining agreements.[3]   (Smith 79)   The position does not provide benefits; specifically, the Plaintiff was not entitled to personal or sick days and was paid only for the days she worked.   (Farruggio 23; Pl. 24)  The position was not supported by substitutes.   (Kenny 29)  The position was assigned to the school where the student was in attendance and did not automatically transfer if the student's placement

---

[1] Citations to the record from herein forward will be made by identifying the record source, e.g. ("Compl.") or Plaintiff's deposition (Pl.), followed by the referenced page number or paragraph.  The cited documents will be attached as exhibits to this motion and memorandum

[2] For student confidentiality, the student's name will shortened to initials only.

[3] The testimony of Charles Raburn indicates the Plaintiff's position was included in the bargaining agreement, but Mr. Raburn did not serve in his current position with human resources at the time of her employment, did not have direct knowledge of the events, and it has since been shown that the position was not covered by the agreement.

changed.[4]  (Kenny 72-73)

B.V. is autistic and is assigned a one-on-one aide for his safety.  (Kenny 70).  He has difficulty with changes in routine; a lack of consistency day-to-day affects his focus, academics and all of his functioning, causing him to become upset and suffer a high level of anxiety.  (Kenny 68-69).  When unmonitored, B.V.'s behaviors include pulling out his hair and creating bald patches, shoving sharp objects into his nose and mouth, picking his nose until it bleeds, and cutting his fingers with sharp objects; these behaviors escalate when he is upset.  (Kenny 70-71; A.V. 53-54)  B.V. could be a danger to himself and others as he was unaware of environmental risks and dangerous situations and was prone to impulsivity without the presence of an aide.  (A.V. 68-69)

Approximately two years prior to starting at Benito, the Plaintiff was diagnosed with a medical condition known as vasovagal syncope, or electrocardiogenic syncope, according to the Plaintiff, which can result in fainting spells.  (Pl. 29)  Prior to the diagnosis, the Plaintiff was fainting constantly.  (Pl. 32)  She was not working during this time period, but this was related to another condition associated with a hysterectomy.  (Pl. 31, 45)  In May 2005, prior to being hired by Benito, the Plaintiff began treatment with Dr. Anne Curtis, who adjusted her medications and gave prevention tips, improving her condition.  (Pl. 32, 35-39)

During her first year of employment, the Plaintiff fainted twice at Benito, once in the hallway with B.V. and again in a classroom.  These incidents were severe enough to require Benito to call the EMTs on both occasions.  Afterwards, no one criticized her performance or threatened her with the loss of her job; in fact, the Plaintiff was told she was an exemplary

---

[4] In fact, the Plaintiff's replacement, Jay Carter did not initially follow B.V. to high school.  The 1-1 aide assigned to B.V. by the high school did not work out and Jay Carter was hired to take over.  (Kenny 76)

employee. (Pl. 54) There were, however, concerns during the 2005-2006 school year due to her poor attendance. (Kenny 21; Smith 18) Without the availability of substitutes, the Plaintiff's absences required ESE Specialist Mikki Kenny to find coverage within Benito, often using herself, teachers or other paraprofessionals. (Kenny 21-24, 29-30, Smith 18) During the 2005-2006 school year, B.V.'s mother would often provide her nanny or her own services to function as the aide, but this was not the case during the 2006-2007 school year. (Smith 18, 23) At the end of the 2005-2006 school year, Principal Bobby Smith weighed the Plaintiff's performance with B.V. against her attendance problems. (Smith 18) Despite the poor attendance, and Smith's awareness of the two fainting spells, he invited the Plaintiff to return for a second school year.[5] (Pl. 18-20; Smith 17)

Shortly after beginning her second year at Benito, the Plaintiff went home early on August 25, 2006 as a result of feeling sick. (Pl. 25) She did not return to work or contact Benito's administration regarding her condition. (Farruggio 25-26) She ignored phone calls from Smith, who was trying to get an update on her status. (Smith 21) At one point, Smith even resorted to calling B.V.'s mother, A.V., for assistance in reaching the Plaintiff; A.V. had to tell Smith the Plaintiff was in the hospital. (A.V. 24, 27) Smith was concerned because he did not know when or if the Plaintiff planned to return to work.[6] (Kenny 26).

On September 18, the Plaintiff showed up at Smith's office. The Plaintiff was wearing a heart monitor as a diagnostic tool. (Smith 25) During the encounter, the monitor

---

[5] Testimony does differ regarding whether or not the administration and staff at Benito knew of the Plaintiff's medical conditions. While the Plaintiff has testified she discussed her condition with administration and staff at Benito, no District personnel that has testified in this case recalls hearing any specifics of the Plaintiff's medical condition until after her termination.

[6] Although some of the staff members had heard she was sick, the Plaintiff did not contact the administration at Benito. (Kenny 31-32, 46).

sounded an alarm, requiring the Plaintiff to call into the monitoring company "as soon as possible" to transmit data.  (Pl. 62-62; Smith 25-26)  This occurred twice during their brief meeting and the Plaintiff became very anxious and concerned.  (Smith 26; Pl. 61-62)  The Plaintiff left Benito to go to her doctor to find out what was wrong.  (Smith 26)  She left without mentioning her condition, any other medical tests or when she would return to work; she also failed to provide any paperwork regarding her absences.[7]  (Smith 27; Farruggio 40)

After the Plaintiff left on September 18, Smith continued to call her for updates, but received no response.  (Smith 34-35)  Benito had no further contact from the Plaintiff after this visit, in spite of Smith multiple attempts to obtain information regarding her status. Smith prepared a letter on October 5, 2006, terminating the Plaintiff's employment for failing to fulfill the duties of the position.  (Smith 39-40, Ex.5)

The Plaintiff received her letter of termination on October 6, 2006.  A.V. called Benito and requested she be reinstated.  (Pl. 66)  When A.V. expressed her desire to see the Plaintiff return to work, Smith said he would rehire the Plaintiff in a minute.  (Pl. 43-44) A.V. felt that the Plaintiff was the best person to work with B.V. and wanted the Plaintiff to come back to work, so the District began looking at reinstatement.  (Smith 84; Kenny 48)  In addition to the wishes of the parent, the District knew the job of a one-on-one aide is a difficult position to fill and the District wanted the Plaintiff to come back to work. (Trumbach 19-20)  The District and the parent were concerned at all times that B.V. receive

---

[7] According to the Plaintiff, she and Smith discussed the Plaintiff having to wear the monitor until October 5 and Smith indicated the monitor alarm could be disruptive.  Although the Plaintiff has testified the monitor was malfunctioning, she did not learn this for approximately one week and never told Smith there was a malfunction.  (Pl. 62-63)  The Plaintiff has testified that Smith informed her it was better to have her tests completed before returning to work because it would be less disruptive.  (Pl. 64)  The District did have concerns that the monitor could be difficult when working with an autistic child.  (Trumbach 24)

the services he needed.  (Trumbach 22-23; Smith 15)

The events surrounding the move towards reinstatement have little bearing on the discrimination claim, as they follow the alleged adverse employment action - the termination. However, the events that followed support both the District's defense and the lack of pretext because it was not until after the termination that discussion began regarding the Plaintiff's medical situation.   While the Plaintiff was absent she had been undergoing medical evaluations, but failed to provide any notice of that fact to Benito.  After her termination, she began to present medical notes to Benito in an attempt for reinstatement.

The Plaintiff sent a letter to Smith on October 12, indicating she was trying to get a work release from her physician.  (Smith 41)  The Plaintiff has focused much of her case on the need for her to obtain a specific form releasing her to work without restrictions.  (Pl. 65, Ex. 7)  She has claimed she could not return to work without it.[8]  According to the Plaintiff, Smith informed A.V. that he required a specific release to work form in order to reinstate. (Pl. 66-67)   However, both Smith and A.V. deny that this conversation ever took place. (A.V. 38; Smith 58)  The Plaintiff was persistent in seeking this non-existent form.  She called human resources and Mary Farruggio, Smith's secretary, both of whom were unaware of its existence.  (Pl. 66, 68, Ex. 7, 8; Farruggio 53-54)

The Plaintiff did begin to collect various work release notes from her doctors, but these notes were not provided to Benito until after the termination.  (Smith Aff. Ex.1)  When she started supplying work releases, it became clear from the information received that the

---

[8] Interestingly enough, the Plaintiff had been talking about this release to work form well before Benito began taking any action at all regarding termination or reinstatement.  On August 29, 2006, the Plaintiff called her physician asking for a work release.

Plaintiff's medical condition would be an issue for purposes of reinstatement, as it resulted in an inability to report to work and the potential of fainting and leaving the student unattended if she did report to work.   Although the Plaintiff was uncertain about the sequence of events, even she agrees she may not have supplied the District with any of these releases until after her termination.[9]  (Pl. 85, 14; Smith Aff. Ex.1)  In an October 13, 2006 letter, the Plaintiff told Smith she had been by the school several times to give him medical documents, but he was not around, so she was leaving him the documents and faxing them to Trumbach. (Smith Aff. Ex.1)  Smith testified that he did not receive any medical notes prior to October 13, 2006.  (Smith 27-28)

In total, the Plaintiff only has evidence of three (3) work release notes.  The first note was signed on September 18, 2006, indicating she could return to work.  (Pl. Ex.6)  The Plaintiff was unclear whether this note was ever given to anyone at Benito prior to termination, but Smith did not receive that note until October 13.  (Smith 27-28)  Regardless, the Plaintiff did not attempt to return to work after leaving Smith's office on September 18, to check on the status of her monitor, and had no further contact with Smith prior to termination.

The second note was allegedly written on October 9, 2006, although it is undated. (Pl. 78, Ex. 10)  The note indicated there was no guarantee the Plaintiff would not pass out again but she could continue to work as a "teacher".  (Pl. Ex. 10)  Of course, the Plaintiff is not a teacher and where the attendance requirements and essential job functions of that job

---

[9] The Plaintiff drafted a memo to herself on October 9, 2006 indicating medical information had been shared, but she later testified the dates could be wrong and her medical information had not been shared at that time. (Pl. 82-87, Ex.3).

are similar, they are not the same as the Plaintiff's position. Trumbach called the doctor for clarification, as the District could not place B.V. in a position where he could be left unattended due to the Plaintiff's fainting and could potentially wander off or get hurt. (Trumbach 16) As always, in education, there were concerns for the safety and welfare of the child and it was important to err on the side of caution. (Trumbach 16)   Trumbach then determined he wanted to see a work release indicating the Plaintiff was able to perform the essential functions of her job with no restrictions. (Trumbach 17) Again, all of this occurred after the Plaintiff's discharge.

The Plaintiff received this third note on October 13, 2006, from Dr. Navarte, who stated the Plaintiff could return to work with no restrictions. (Pl. Ex. 11) The District did not receive Dr. Navarte's release on that date, as the Plaintiff clearly indicated that she was still trying to get the release as of October 13, 2006 and A.V. indicated she was aware the District had not yet received the release on October 16 or 17. (Pl. Ex. 8; Smith Ex. 13; A.V. 44) When District received the release from Dr. Navarte, they believed that "no restrictions" meant that she would not pass out again. (Trumbach 17) When this release was received, Smith shared it with Trumbach who then directed Smith to offer reinstatement. (Smith 91; Trumbach 17)

Smith prepared the reinstatement letter on November 10, 2006, and it was reviewed by Trumbach. (Trumbach 18-19; Smith 64-65, Ex. 15). The Plaintiff continued to ignore calls from Smith, but they eventually met on November 15, 2006. (Smith Ex.1). The Plaintiff however, was insulted by the offer of reinstatement letter, which reads:

> "The Hillsborough County Public School District has accepted your physician's release to work. It is always good to see an employee return to a

state of good health.  With this release, you are being offered re-employment in your most recent position as a one-on-one ESE Aide at Benito Middle School…. It is our hope that your good health continues to allow you to serve as a productive employee of our school district.   Should circumstances change, we will address them accordingly".  (Pl. 10, Ex. 1).

Specifically, the Plaintiff She did not approve of the comment regarding continued good health.  (Pl. 10-12; 129-132)  She informed Smith she needed to think about the offer and to talk to her husband; she then ignored calls from Smith for two days.  (Pl. 134; Smith Ex.1)  On November 20, 2006, the Plaintiff sent an email to Smith stating she had retained an attorney and needed to discuss the issue with him on November 22.  (Pl. Ex. 14)  That was the last communication she had with Smith or the District and she neither accepted nor denied the offer.  She has since admitted she refused acceptance because she did not like the wording of the letter and believed that Smith's "words were saying one thing, but his eyes were saying something else.  He didn't act like he wanted me back." (Pl. 132)  She has since accepted employment with a higher rate of pay.  Her claim rests mostly on a request for compensatory damages for psychological injuries she admits existed prior to this event and have not changed in diagnosis or treatment.   (Pl. 102-104, 120-124)

The Plaintiff's testimony was consistently self contradicting and in contradiction to the evidence.  The Plaintiff denied looking for work prior to her termination, but clearly was seeking other employment in September 2006.  (Pl. 9-13; New Tampa Christian Academy) The Plaintiff testified she was putting all her energy into trying to get reinstated at Benito, but refused to accept it when offered.  (Pl. 9)  The Plaintiff has repeatedly misstated her education and training, telling school board members and A.V. she held a degree in

psychology which she has since admitted she does not have.[10]  (Pl. 70-71, Ex. 9)  In her quest

to be reinstated, she told school board members she had five physicians' written consents for

her to return to work, but has since admitted she was just "approximating".  (Pl. 74, Ex.9)

Although the Plaintiff has testified that everyone in the school knew about her vasovagal

syncope prior to her termination, this has been denied by the District employees who have

been deposed.  (Rohl 26-28, 53-55; Farruggio 15-16; Smith 59; Kenny 17-18)  In fact, when

asked to report any medical conditions on an emergency list in the beginning of the 2006-

2007 school year, the Plaintiff listed only an allergy to shellfish.  (Farruggio 16; Smith 93)

## LEGAL ARGUMENT

**A.     The Plaintiff Cannot Prevail on her Claims[11]**

The Americans with Disabilities Act prohibits employers from discriminating against

a qualified individual because of a disability. 42 U.S.C. § 12112(a). The burden of

establishing her claim falls on the shoulders of the complaining employee. Holbrook v. City

of Alpharetta, Ga., 112 F.3d 1522, 1526 (11th Cir. 1997). To prove a violation, the Plaintiff

must first show that she "(1) had a disability; (2) was otherwise qualified to perform all the

essential functions of her job with or without reasonable accommodation; and (3) was

discriminated against based on [her] disability." Collado v. United Parcel Serv. Co., 419 F.3d

1143, 1149 (11th Cir. 2005); Morisky v. Broward County, 80 F.3d 445, 447, 6 AD Cases

1409, 1412 (11th Cir. 1997). The burden shifting analysis of Title VII employment

discrimination actions is applicable to ADA claims. See Moses v. American Nonwovens,

---

[10] Following her deposition, she has since clarified this "misunderstanding" with A.V. and admitted she did not
have a psychology degree.  (A.V. 51)
[11] As courts construe the FCRA and the Rehabilitation Act in conformity with the ADA, Defendant will discuss
the claims asserted under these three statutes together. See Smith v. Avatar Properties, Inc., 714 So.2d 1103,
1106 (Fla. 5th DCA 1998); see also Cash v. Smith, 231 F.3d 1301, 1305 n. 2 (11th Cir. 2000).

Inc., 97 F.3d 446, 447 (11th Cir. 1996). Once an employee establishes a prima facie case, the employer must present a legitimate, non-discriminatory reason for the adverse action it took. Wascura v. City of South Miami, 257 F.3d 1238d, 1242-43 (11th Cir. 2001). The District's burden is one of production only, and not a burden of persuasion.  Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).   If the employer satisfies this obligation, the employee must then show that the stated reason is mere pretext. Id.

> 1.        **The Plaintiff does not have a disability as defined by law[12]**

Not every medical diagnosis of impairment is a disability under the ADA. Toyota Motor Manufacturing Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002). Disability is defined as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment."[13] 42 U.S.C. § 12102(2); Cash v. Smith, 231 F.3d 1301, 1305 n. 2 (11th Cir.2000).  An impairment is not a disability under the ADA unless it substantially limits a major life activity.  Pritchard v. Southern Co. Services, 92 F.3d 1130, 1132-1133 (11th Cir. 1996).   The only major life activity addressed by the Plaintiff in the instant case is work. In order for a condition to substantially limit the ability to work, it must "significantly restrict[ ] ... the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Pritchard,  92 F.3d at 1133 (citing 29 C.F.R. § 1630.2(j)(3)(I)).

There is no substantial limitation if the impairment merely prevents a person from

---

[12] The Defendant acknowledges the ADA Amendments Act of 2008 and addresses its impact on this analysis below.
[13] The Plaintiff has claimed that she is qualified as a person with a disability based on prongs (a) and (c).  (Doc. #11 p.15).

performing "either a particular specialized job or a narrow range of jobs." 29 C.F.R. § 1630.2(j)(3).  The inability to perform a "single, particular job" is not a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(I); see also Davis v. Sailorman, Inc., 2008 WL 2439999 (11th Cir.2008)(holding that the inability to perform a specific job is not a substantial limitation on the major life activity of working).   Although the Plaintiff cannot decide whether she has disability or if she was just regarded as being disabled, she repeatedly refers to herself as a person with a disability.  (Pl. 9-10, 11, 66)  Interestingly, the amended complaint pleads a cause of action for perceived disability only, yet alleges her medical condition required accommodations that were granted to her.  (Doc. 14)  However, the Plaintiff's medical condition is not a disability and her claim must fail as a matter of law.

> **a.     The Plaintiff's episodic fainting did not substantially limit one or more major life activities**

The only major life activity at issue in this case is work.[14]  (Doc. 14; Doc. 22)  The Eleventh Circuit has "stressed that "substantially limits" means "prevents or severely restricts" rather than requiring only a "diminished activity tolerance"."  Roberts v. Rayonier, Inc., 135 Fed.Appx. 351, 356 (11th Cir. 2005)(citing Rossbach v. City of Miami, 371 F.3d 1354, 1358 (11th Cir. 2004); Hilburn v. Murata Electronics, 181 F.3d 1220, 1228 (11th Cir. 1999)).  While work itself is a major life activity, a condition that affects a person's ability to perform a particular job but not a broad class of jobs is not a disability. See D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1227 (11th Cir. 2005); Heflin v. PPG Industries, Inc.,

---

[14] When asked to describe impact of her condition and the fainting episodes on her life, the Plaintiff described a lack of confidence in herself and worrying by her children and husband.  (Pl. 13-115).  Lack of self confidence does not qualify as a substantial limit on a major life activity.  See Grose v. Bank One, N.A., 2008 WL 631174 *5 (E.D. Ky. 2008).  There is no law that supports the notion that worrying by family members qualifies a person as disabled.  The Plaintiff admitted she could perform all household tasks.  (Pl. 15).

2007 WL 4125458, *6, (N.D.Ga. 2007).

The Eleventh Circuit has held that loss of consciousness in the work place, that is infrequent and controlled by medication, does not substantially limit a major life activity. Sicilia v. United Parcel Service, Inc., 2008 WL 2223051, *2 (11th Cir. 2008) In Sicilia, the employee suffered from epilepsy and suffered two seizures in two days. Id at *1. In spite of suffering two seizures at work, Sicilia admitted the seizures were infrequent and controlled by medication. Id at *2. The Eleventh Circuit determined Sicilia's condition did not substantially limit a major life activity. Id. The Plaintiff in the instant case has similarly defined her syncope.

### b.    Vasovagal Syncope is not a protected disability

The Plaintiff's medical condition at issue in this case is vasovagal syncope or electrocardiogenic syncope. Courts have found that syncope does not qualify as a disability as defined by the relevant statutes. One court recently found "disorders such as syncope, that are well controlled by medication, do not qualify under the ADA as a disability because they do not affect a major life activity". Durham v. McDonald's Restaurants of Oklahoma, Inc., 2008 WL 3992146, 3 (N.D.Okla. 2008). In Cadely v. New York City Dept. of Transp., 2008 WL 465199 (S.D.N.Y. 2008), an employee who had fainted six times in seven years, as a result of syncope, was not found to be disabled as the fainting episodes did not substantially limit a major life function. The Sixth Circuit held an employee's heat induced vasovagal syncope did not substantially limit a major life activity. Greer v. Sears, Roebuck & Co., 54 F.3d 776 (6th Cir.1995).

### c.    The District did not regard the Plaintiff as disabled[15]

The Plaintiff's claim that the District regarded her as disabled must fail.  A person is regarded as having an impairment if she (1) has an impairment that does not substantially limit a major life activity, but is treated by an employer as though she does; (2) has an impairment that substantially limits a major life activity only because of others' attitudes towards the impairment; or (3) has no impairment whatsoever, but is treated by an employer as having a substantially limiting impairment.[16]  Thompson v. City of Seminole City Council, 2007 WL 2827579, *6-7 (M.D. Fla. 2007)(citing 29 C.F.R. § 1630.2(l)).  See also Rivera v. Orange County School Bd., 2000 WL 33176009, 6 (M.D.Fla. 2000); Standard v. A.B.E.L. Serv., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998).

The evidence shows that despite fainting twice during the 2005-2006 school year, the Plaintiff was asked to return for the 2006-2007 school.  She was not criticized for her fainting spells.  (Pl. 50).  The evidence clearly shows that the issue of physical limitations arose only after the termination, and to that extent involved only the Plaintiff's abilities to perform the essential job functions.  And even then, the Plaintiff was offered reinstatement.

The Plaintiff did not apply for or request another position nor was she rejected from any other position.  In order to be reinstated, the District needed to determine whether the Plaintiff could be present to perform her job and whether B.V.'s would be safe.  Evidence

---

[15] Although it is clear that the Plaintiff was not disabled or regarded as disabled under the ADA, the Plaintiff argues that she is disabled on pages 15-16 of her motion, but then argues she is only perceived as disabled on pages 17-18 of her motion.  If the Plaintiff truly believes there is such a question of fact over whether or not she is disabled under the ADA, the Plaintiff's motion should be denied on that basis alone.

[16] "The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled."  Sutton v. Lader, 185 F.3d 1203, 1209 (11th Cir. 1999).

that an employee cannot safely perform a particular task is not evidence of a perceived disability.  Sutton v. Lader, 185 F.3d 1203, 1209 (11th Cir. 1999).  An employer is entitled to require a fitness for duty examination if it is job-related and consistent with business necessity.  Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999)(citing 42 U.S.C. § 12112(d)(4)(A).  The evidence shows the Plaintiff had a problem with absenteeism and then submitted a work release note that included limitations affecting her ability to perform her specific job.  "Where a defendant's recognition of plaintiff's limitations was not an erroneous perception, but instead was a recognition of a fact,... a finding that a plaintiff was regarded as disabled...is inappropriate."  Hilburn v. Murata Electronics, 181 F.3d 1220, 1230 (11th Cir. 1999).

As the District believed the Plaintiff performed her job well when present and the concern was absenteeism and student safety, there is no evidence that the District regarded the Plaintiff as disabled.  See Ramirez v. New York City Bd. of Educ., 481 F.Supp.2d 209 (E.D.N.Y. 2007) (school board did not regard teacher as disabled within meaning of ADA, even if his supervisors were aware of his high blood pressure, depression, and other ailments, where principal testified that the teacher "taught when he was present and it was instructionally sound," and supervisor testified that the teacher was "satisfactory" and that she was mostly concerned with number of instructional days he missed).  Employer knowledge of an impairment, which is suspect at best in this case, is not sufficient to meet the "regarded as" standard.  Sutton, 185 F.3d at 1209; see also Keeler v. Florida Dept. of Health, 559 F.Supp.2d 1298, 1307 (M.D.Fla. 2008)(holding same).  The Plaintiff's attempt to

show the District had knowledge of her diagnosis and impairment does not establish a prima facie case.

### d.       The impact of the ADAAA

The ADA Amendments Act of 2008 was signed into law in September 2008, but is not effective until January 2009.  The retroactive effect of this Act is questionable.  <u>See</u> <u>Verhoff v. Time Warner Cable, Inc</u>., 2008 WL 4691794 (6th Cir. 2008); <u>DuBerry v. District of Columbia</u>, 2008 WL 4683073 (D.D.C. 2008); <u>Cook v. Union Pacific R. Co</u>., 2008 WL 4540164 (D.Neb.2008); <u>Ragusa v. Malverne Union Free School Dist</u>., 2008 WL 4527739 (E.D.N.Y. 2008).  If the Act was retroactive, it would affect only the first element of the prima facie case, which is whether or not the Plaintiff had a disability.[17]  It would have no known affect on the remaining elements of the prima facie case and summary judgment would be appropriate as the Plaintiff cannot show she was otherwise qualified or that there was discrimination based on her disability.

The Middle District of Florida has already addressed the implications of the ADAAA in determining whether or not an employee is a person with a disability.  <u>See</u> <u>Llewellyn v.</u> <u>Tampa Elec. Co</u>., 2008 WL 4544462 (M.D.Fla.2008).   Judge Moody noted that "an individual is substantially limited in the activity of working if he or she is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities'."

---

[17] The Defendant notes that the ADAAA specifically states its' intent to overturn several Supreme Court opinions including <u>Toyota Motor Manufacturing, Kentucky, Inc. v. Williams</u>, 534 U.S. 184 (2002) and <u>Sutton v. United Air Lines, Inc</u>., 527 U.S. 471 (1999) which take into account mitigating measures, such as medications, when looking at whether an impairment substantially limits a major life activity.  At all times relevant to this case, the law as stated by the Supreme Court was that the ameliorative effects of mitigating measures, such as medications, were to be taken into account when looking at whether an impairment substantially limits a major life activity.

Id. at *5 (citing 29 C.F.R. § 1630.2(j)(3)(i)).  Additionally, the "inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id. (citing C.F.R. § 1630.2(j)(3)(i)).  In recognizing the Congressional action, Judge Moody noted that "one of the stated purposes of the 2008 ADA Act is to 'express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines 'substantially limits' as 'significantly restricted' to be consistent with [the] Act, including the amendments made by [the] Act'." Id. at*5, n.8. However in Llewellyn, as in the instant case, the Plaintiff failed to show that she was "limited or restricted to perform a class of jobs or a broad range of jobs and thus has failed to establish impairment under either standard".  Id.

## II.    The Plaintiff was not otherwise qualified, with or without a reasonable accommodation

The Plaintiff was not otherwise qualified to perform her job.  Under the ADA, a "qualified individual with a disability" is identified as "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m)(2006).   "An individual is qualified if he, with or without reasonable accommodation, can perform the essential functions and job requirements of the position the individual holds." Earl v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000).  ""Essential functions" are the fundamental job duties of a position that an individual with a disability is actually required to perform." Id. (citing 29 C.F.R. § 1630.2(n)(2)(1)).  When an individual is unable to perform the essential functions of a job, "the burden of identifying the

accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997).

The law requires that consideration "be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). A job function also may be essential if there are a limited number of employees among whom performance of the job can be distributed. Earl, 207 F.3d at 1365 (citing 29 C.F.R. § 1630.2(n)(2)(ii); Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 (11th Cir. 1997)). The Plaintiff's job required regular attendance and an ability to provide constant monitoring and support; thus, the Plaintiff's poor attendance and intermittent fainting without warning rendered her unqualified. Rocky v. Columbia Lawnwood Regional Medical Center, 54 F.Supp.2d 1159, 1166 (S.D.Fla.1999).

The Plaintiff's duties could not be performed if the Plaintiff was not in attendance. See Tyndall v. National Educ. Ctrs., 31 F.3d 209, 213 (4th Cir. 1994). "If the nature of an employee's position requires her to regularly and reliably attend work, and she fails to meet that requirement, then she is not qualified for her job." Rocky v. Columbia Lawnwood Regional Medical Center, 54 F.Supp.2d 1159, 1166 (S.D.Fla. 1999) (citing Jackson v. Veterans Admin., 22 F.3d 277, 278-79 (11th Cir.1994)). Attendance has specifically been found to be an essential job function of a teacher. Tyndall, 31 F.3d at 213; see also Nowak v. St. Rita High School, 142 F.3d 999 (7th Cir.1998); Ramirez v. New York City Bd. of Educ., 481 F.Supp.2d 209 (E.D.N.Y. 2007). While the Plaintiff was not a teacher, the attendance factor is even more important because substitutes were not available. For a one-on-one aide

working with an autistic child who needs constant support, one week of missed work can be a substantial period of time.  (Trumbach 14)  The Plaintiff has not disputed that attendance was an essential function of her job.

Even if in attendance, the Plaintiff would still be unqualified because fainting without warning could result in B.V. being unsupervised.  The Plaintiff did not ask for accommodations, nor are any accommodations reasonable.  The ADA does not require employers to reallocate or eliminate essential job functions in order to accommodate an employee.  Vaughn v. Nationsbank Corp., 137 F.Supp.2d 1317, 1325 (N.D.Ga.2000).  It would be unreasonable to require the District to provide a back up one-on-one aide in the event of a fainting episode.  See Christianson v. Eau Claire Area School Dist., 2000 WL 34231486 (W.D.Wis. 2000)(finding a special education teacher with asthma who requested outdoor recess activities be supervised by someone else  was an unreasonable accommodation, as it changed the essential functions of the job).

It is irrelevant for these purposes whether or not the Plaintiff performed her job well and possessed the skills needed for the position because her frequent absences and sudden fainting spells prevented her from fulfilling her duties.  It is also irrelevant whether or not the Plaintiff was going to be able to perform her essential job duties at some unknown point in the future.[18]  Significantly, the applicable provisions of the ADA and the regulations interpreting the ADA (42 U.S.C. § 12111(8); 45 C.F.R. § 1232.3(i)), contain no reference to a person's *future* ability to perform the essential functions of his position.  Wood v. Green, 323 F.3d 1309, 1313 (11th Cir. 2003)(citing Duckett v. Dunlop Tire Corp., 120 F.3d 1222,

---

[18] "The existence of some nonmaterial factual dispute is insufficient to survive a motion for summary judgment."  Holder v. Nicholson, 2008 WL 2812481, 4 (11th Cir.2008); Chapman, 229 F.3d at 1023 (en banc).

1226 (11th Cir. 1997).

Another reason the Plaintiff was unqualified was because her intermittent fainting spells were a direct threat to the student in her care.  A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3).  Instead of treating the issue of direct threat as a defense, the courts evaluate the issue in the context of whether the employee is qualified for the job.   See LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 836 (11th Cir. 1998). "The employee retains at all times the burden of persuading the jury either that he was not a direct threat or that reasonable accommodations were available." [19]   LaChance v. Duffy's Draft House, Inc., 146 F.3d 832 (11th Cir. 1998)(citing Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir.1997)).

Where the essential job function implicates the safety of others and those entrusted into her care, the employee must demonstrate she can perform the job without harming others.  See Justice v. Crown Cork and Seal Co., Inc. 527 F.3d 1080, 1091 (10th Cir. 2008); see also Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11(1st Cir. 2002)(holding the same); E.E.O.C. v. Amego, Inc., 110 F.3d 135, 144 (1st Cir. 1997)(noting that when the employee is responsible to ensure the safety of others entrusted to her care, courts have simply considered the risk question to be part of the "qualified" analysis.").

The October 9 work release note clearly indicated the Plaintiff could faint without warning, and this could result in B.V. left unsupervised and in danger.  The Plaintiff can only

---

[19]  The Plaintiff has previously directed the Court's attention to other cases involving the issue of direct threat. However, these cases are not applicable here.  Chevron U.S.A. Inc. v. Echazabal, 536 U.S. 73 (2002) involved the issue of a direct threat to the individual employee.  Crutcher v. Mobile Housing Board, Not Reported in F.Supp.2d, 2005 WL 2675207 (S.D.Ala. 2005), does not involve an employee whose essential job function involves the safety of others.

overcome evidence of a "direct threat" by showing that there was a reasonable accommodation that would "alleviate the risk".   See Richey v. City of Lilburn, 127 F.Supp.2d 1250, 1263 (N.D.Ga. 1999)(holding that emergency dispatcher "may be fully capable of performing her duties most of the time, her inability to react or communicate coherently during a TIA poses a direct threat to police officers and to the general public seeking emergency assistance through the 911 service.") The Plaintiff has not submitted any evidence of reasonable accommodations that would have protected the safety of B.V. in the event of a fainting episode while he was in her care.   "An accommodation can qualify as "reasonable," and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job"; employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1259-1260 (11th Cir. 2001)(citing LaChance, 146 F.3d at 835).

### III.      The Plaintiff was not discriminated against because of her disability

The District has put forth a legitimate non-discriminatory reason for the dismissal. The termination letter clearly states she is being terminated for her inability to fulfill the responsibilities of her position.  (Pl. Ex.2)  The Plaintiff must rebut this reason to show pretext. Chapman v. AI Transport, 229 F.3d 1012, 1030 n. 19 (11th Cir. 2000)(en banc).  She cannot meet her burden by recasting the reasons asserted, substituting her own business judgment, or quarreling with the wisdom of those reasons.  Id.

The Plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).  Pretext means more than inconsistency; pretext is "a lie, specifically a phony reason for some action."  Silvera v. Orange County School Bd., 244 F.3d 1253, 1261 (11th Cir. 2001). Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.  See Alexander v. Fulton County, GA., 207 F.3d 1303, 1341 (11th Cir. 2000).

The Plaintiff has not put forth any evidence to rebut District's reasoning for the termination.  She does not deny she was absent nor does she explain how she could perform her job if she was not present.  She does not rebut her failure to return calls from Smith.  She admits her absence had a negative impact on B.V.  (Pl. 67)  She admits not providing any medical records to the District until after her termination.  (Pl. 85)  She admits no discriminatory intent as she was hired for a second year even after fainting twice the year prior and admits she felt Smith was always honest with her.  (Smith Aff. Ex.1)  The Plaintiff has failed to show that the reasons proffered by the District for her were pretextual.

Courts do not sit as a "super-personnel department."  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  Additionally, the Court's role is not to re-examine the company's decisions about how to structure its business, and the Court's "inquiry is limited to whether the employer gave an honest explanation of its behavior."  Chapman, 229 F.3d at 1030.  The Plaintiff attempts what these cases forbid, namely the second-guessing of management decisions, without independent proof of an illegal motive.

Even if the Plaintiff was able to produce such evidence, this evidence may still not preclude summary judgment.  Chapman, 229 F.3d at 1025, n.11 (finding that an employer would be entitled to a judgment as a matter of law and summary judgment, modifying part of the court's decision in Combs, depending on the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false and any other evidence that supports the employer's case).  "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Id. at 1024-25.  A reason is not pretext for discrimination unless it is shown that the reason was false and that discrimination was the real reason. Wofsy v. Palmshores Retirement Community, 2008 WL 2747025, 3 (11th Cir. 2008)(citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993)).

The Plaintiff solely focuses on post termination events. She attempts to attack the reinstatement offer letter from Smith.  However, the letter speaks for itself, does not include false or improper statements, and is problematic only in the Plaintiff's own mind.  She complains about work release notes, even though the District had not asked for one until she gave then notes indicating she had restrictions.  None of the Plaintiff's complaints show pretext for the District's non-discriminatory basis for termination.

**IV.   Damages**

An employee is responsible for mitigating her damages.   The refusal of an unconditional offer of reinstatement will cut off back pay liability as of the date of the offer, as a failure to mitigate damages.  Ford Motor Co. v. EEOC, 458 U.S. 219, 231-232 (1982).

See also NLRB v. Pepsi Cola Bottling Co. of Fayetteville, 258 F.3d 305, 310 (4th Cir. 2001).

This standard has been found to be applicable in ADA cases. See Albert v. Smith's Food &

Drug Centers, Inc., 356 F.3d 1242 (10th Cir.2004)  The Plaintiff refused to accept the offer

because she felt it was conditioned on her health.  The offer speaks for itself and contains

nothing improper.  An employee cannot refuse an offer of reinstatement because her feelings

were hurt or because she did not feel the offer was bona fide.  See Cowen v. Standard

Brands, Inc., 572 F.Supp. 1576 (D.C.Ala.1983).  An offer rejected solely for personal reasons

will not avoid the ruling in Ford.  Albert, 356 F.3d at 1253.

> **V.     Conclusion**

Based on the foregoing, the District is entitled to summary judgment as a matter of

law.

Respectfully submitted,

/s/ Thomas M. Gonzalez
THOMAS M. GONZALEZ
Florida Bar Number: 192341
CAREN R. SKVERSKY
Florida Bar Number: 514586
THOMPSON, SIZEMORE, GONZALEZ &
    HEARING, P.A.
201 N. Franklin St., Ste. 1600
Tampa, Florida 33602
Telephone: 813-273-0050
Facsimile: 813-273-0072
Email: tgonzalez@tsg-law.com
Email: cskversky@tsg-law.com
Attorneys for the Defendant

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 31st day of October, 2008, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice

of electronic filing to the following:

> Matthew W. Dietz
> Law Offices of Matthew W. Dietz, P.L.
> 2990 S.W. 35th Avenue
> Miami, Florida 33133-3410
> Email:  <u>MatthewDietz@USDisabilitylaw.com</u>

> <u>*/s/ Thomas M. Gonzalez*</u>
> Attorney