UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SHERRIE KAW,

       Plaintiff,

v.                    Case No.  8:07-cv-2222-T-33TGW

SCHOOL DISTRICT OF HILLSBOROUGH
COUNTY,

       Defendant.
_____/

## ORDER

This cause comes before the Court pursuant to Plaintiff Sherrie Kaw's Motion for Partial Summary Judgment (Doc. # 22), which was filed on August 25, 2008. Defendant, School District of Hillsborough County, filed its response in opposition to Plaintiff's motion for partial summary judgment on September 12, 2008. (Doc. # 23). Thereafter, on October 31, 2008, Defendant filed its motion for summary judgment. (Doc. # 33). Plaintiff filed her response in opposition to Defendant's motion for summary judgment on November 20, 2008. (Doc. # 47).

After due consideration, the Court denies both motions for summary judgment for the reasons that follow.

## I.  Factual Background

### A.  Plaintiff's Medical Condition

Plaintiff was diagnosed with a condition known as

electrocardiogenic syncope, also known as vasovagal syncope, in 2002. (Kaw Dep. Doc. # 34 at 29:2-25). The condition causes fainting spells. (Id.). Prior to her 2002 diagnosis, Plaintiff was fainting constantly, and Plaintiff testified that her fainting compromised her ability to care for her children. (Id. at 32:14-16). In May 2005, Plaintiff began treatment with Dr. Anne Curtis, and, under Dr. Curtis' care, her condition improved. (Id. at 37:11-22, 39:16-25).

### B.  **Plaintiff's Employment**

In the summer of 2005, Plaintiff was hired by Bobby Smith, Principal of Louis Benito Middle School, as a one-on-one aide or paraprofessional to an autistic child. (Smith Dep. Doc. # 38 at 14:2-10). To protect the identity of the child, this Court will refer to the child as "B.V." As a one-on-one aide, Plaintiff worked with Mikki Kenny, an ESE specialist, at Benito Middle School. (Kaw Dep. Doc. # 34 at 21:1-25, 22:1). According to Kenny, Plaintiff was responsible for the safety, security, and functioning of B.V. (Kenny Dep. Doc. # 24 at 31:1-7; Smith Dep. Doc. # 38 at 80:20-25). According to Kenny, B.V. has very "unique needs":

> Well, he--the reason behind [B.V.] having the
> unique needs or one-on-one paraprofessional is for
> his safety. And it was for his environmental
> safety. He was unaware of--when he was in danger
> or community dangers. And it was to keep him

> focused and on task and to feel safe, somebody to
> sit next to him for the constant cueing and
> prompting. When somebody wasn't there to monitor
> that, he would easily pull out his hair, he would
> easily put stuff in his nose, sharpened pencils and
> make himself bleed and get blood everywhere.

(Kenny Dep. Doc. # 24 at 70:9-25).

Plaintiff's position was created solely for the purpose of meeting B.V.'s needs as defined by his Individual Education Plan (IEP). (Smith Dep. Doc. # 38 at 16:4-6, 80:20-25). Plaintiff was paid by the hour and was not entitled to benefits, such as personal days or sick days. (Kaw Dep. Doc. # 34 at 24:4-7). When Plaintiff was absent from work, Kenny had to find coverage for Plaintiff within Benito Middle School, often using herself, teachers, or other paraprofessionals to assist B.V. (Kenny Dep. Doc. # 24 at 21:23-25, 22:1-8). According to Kenny, Plaintiff was frequently absent from work: "My only concern was that she missed a lot of work. I had no concerns with her dealings with [B.V.]. She was great at her job with [B.V.]. My concern was that she missed an awful lot of work, and I was –– I had to find coverage quite a bit for [B.V.]." (Id. at 21:8-12). Kenny reported Plaintiff's absences to Principal Smith. (Smith Dep. Doc. # 38 at 18:1-13). During his deposition, Principal Smith acknowledged that Plaintiff had "absenteeism"

3

issues during the 2005-2006 school year. (Id. at 18:1-25).

During the 2005-2006 school year, Plaintiff fainted two times at work: once in the hallway with B.V. and once in the classroom. (Kaw Dep. Doc. # 34 at 49:7-25, 50:1). During both of these fainting spells, Plaintiff lost consciousness and the paramedics were called. (Id. at 49:7-12). However, at the end of the 2005-2006 school year, Principal Smith weighed her attendance record and her relationship with B.V. and, due to her good relationship with B.V., Principal Smith invited Plaintiff to return for a second school year. (Smith Dep. Doc. # 38 at 18:21-15).

On August 25, 2006, shortly after beginning her second year as an aide to B.V., Plaintiff felt lightheaded. (Kaw Dep. Doc. # 34 at 58:5-14). Plaintiff consulted with the school nurse, Starla Rohl, as well as Principal Smith's secretary, Mary Farruggio, and was apparently advised to go home and to see her physician. (Id.).

On September 18, 2006, Plaintiff stopped by Principal Smith's office without a scheduled appointment, and Plaintiff was wearing a heart monitor. (Kaw Dep. Doc. # 34 at 61:10-14; Smith Dep. Doc. # 38 at 25:14-15, 26:1-23). Plaintiff's heart

monitor went off two times. (Kaw Dep. Doc. # 34 at 62:16-21).[1]
Principal Smith asked how long Plaintiff would be required to
wear the monitor, and Plaintiff responded that she was
required to wear the monitor for 30 days. (Id. 61:23-25).
Plaintiff states that Principal Smith suggested that it would
be better if Plaintiff completed all of her medical tests
before returning to work and that a beeping heart monitor
could pose a distraction. (Id. at 63:16-17). Smith denies
that he made these statement to Plaintiff during the meeting.
(Smith Dep. Doc. # 38 at 31:4-6).

During his deposition, Principal Smith commented that
Plaintiff seemed very anxious during the meeting, and that the
"thought crossed his mind" that Plaintiff might have a heart
attack in his office that very day. (Smith Dep. Doc. # 38 at
32:20-22). During the September 18, 2006, meeting,
Plaintiff did not provide Principal Smith with information
about why she had been absent from work for several weeks or
when she would be returning to work. (Id. at 27:10-11).

After the worrisome meeting with Plaintiff on September
18, 2006, Principal Smith called Plaintiff on September 19,

---

[1]    Apparently, Plaintiff's heart monitor was
malfunctioning, but neither Plaintiff nor Defendant was aware
of the malfunction at the time of the meeting. (Kaw Dep. Doc.
# 34 at 62:4-14).

2006, and again on September 29, 2006, to inquire as to the status of Plaintiff's health and her ability to return to work, and Plaintiff did not return his calls. (Id. at 33:11-21).

## C.  Plaintiff's Termination and Offer of Reinstatement

As of September 26, 2006, Plaintiff had not returned to work, and Principal Smith consulted with Joseph Trumbach, the Manager of the Office of Professional Standards for the School Board of Hillsborough County. Trumbach testified that Principal Smith called him in early October of 2006, and indicated that "Kaw had missed a great deal of work and was having some difficulty with her medical issues." (Trumbach Dep. Doc. # 39 at 10:18-20).

Trumbach called Principal Smith and advised Principal Smith that Plaintiff could be terminated due to her failure to fulfill her employment duties. (Smith Dep. Doc. # 38 at 35:3-6). Trumbach offered a great deal of testimony on this issue during his deposition. Trumbach was asked: "Was your determination that Ms. Kaw could not do the essential requirements of her job as a result of her condition and her fainting?" (Id. at 14:12-14). Trumbach responded:

> It was a determining factor that she was not able
> to perform her essential functions of her job
> because she couldn't be there to work with that

6

> individual child. . . . It's my understanding that
> Ms. Kaw had a condition, a heart condition that
> caused her potentially to pass out, faint. And she
> had some issues that were concerns to Mr. Smith.
> Had she been in the position where she was with
> that child one on one and had one of these
> episodes, it could have put the child's life,
> health, and safety in danger, hurt not only the
> child, but herself, also, and the community and the
> school itself.

(Id. at 14:15-25, 15:1-2).

Trumbach also remarked: "Again, we're in the kid business, and if we're going to err, we're going to err on the side of the child. And I wanted to be sure that she wasn't going to be placed in a position where she was with that child, passed out, and subsequently we would be in a precarious position, that child being an autistic child, and could wander off the campus, get hurt, any of those types of things." (Id. at 16:12-18).

On September 29, 2006, after hearing nothing from Plaintiff, Principal Smith authored a letter terminating Plaintiff for failure to fulfill her duties. (Smith Dep. Doc. # 38 at 39:6-8). Principal Smith's letter terminating Plaintiff stated in full:

> I must regretfully inform you that your employment
> at Benito Middle School will end on October 5,
> 2006. This is due to concerns that [you] are not
> able to fulfill the responsibilities of the
> position for which you were hired. It is requested
> that you immediately return any property in your

possession that belongs to the school district and
make any arrangements to remove any personal
property you may have left at the school.  Please
trust that this was not an easy decision or made in
haste.   I wish you success in your future
endeavors.

(Doc. # 22-8; Doc. # 34-2 at 2).

Principal Smith testified that the main reason why Plaintiff could not fulfill the responsibilities of Plaintiff's position was due to Plaintiff's poor attendance record. (Smith Dep. Doc. # 40 at 40:10-23).  Principal Smith explained, "If she's not there daily, predictably, regularly, then she cannot provide all the other necessary essentials that a one-on-one aide does for the child." (Id. at 41:3-6).

After Plaintiff's termination, Plaintiff began sending various medical documents and letters to Benito Middle School. On October 12, 2006, Plaintiff sent Principal Smith a letter indicating that she was attempting to obtain a work release form from her physician. (Smith Dep. Doc. # 38 at 41:1-25). Shortly thereafter, Plaintiff provided work release information and various doctors' notes to Principal Smith. One of the letters, from Dr. Blanco and Dr. Curtis indicated: "Although we cannot guarantee she will not pass out again, there is no medical reason that she cannot return to work with minor precautions." (Doc. # 34-2 at 15). Other notes described

Plaintiff's condition, specifically the risk of fainting. (Doc. # 34-2 at 4-7). In addition, Plaintiff tendered a release to work from another physician, Dr. Narvarte, who indicated that Plaintiff could return to work with no restrictions. (Doc. # 34-2 at 16).

When Dr. Navarte's letter was received by Principal Smith, he shared it with Trumbach. Trumbach, in turn, directed Principal Smith to offer Plaintiff reinstatement. (Smith Dep. Doc. # 38 at 64:18-25).

On November 10, 2006, Principal Smith sent Plaintiff an offer of reinstatement, which follows:

> The Hillsborough County Public School District has accepted your physician's release to work. It is always good to see an employee return to a state of good health. With this release, you are being offered re-employment in your most recent position as a one-on-one ESE Aide at Benito Middle School. You will be assigned to student [B.V.]. It is our hope that your good health continues to allow you to serve as a productive employee of our school district. Should circumstances change, we will address them accordingly.

(Doc. # 34-2 at 1).

Plaintiff was not satisfied with this offer. She determined that it was a conditional offer based upon an improvement in her vasovagal syncope, which did not actually improve at all. On November 20, 2006, Plaintiff contacted Smith indicating that Plaintiff had hired an attorney to

address these matters.

**D.  <u>Litigation Ensues</u>**

On December 7, 2007, Plaintiff filed her complaint against Defendant, the School District of Hillsborough County. (Doc. # 1).  On February 13, 2008, Plaintiff filed her amended complaint against Defendant. (Doc. # 14).  In count one of the amended complaint, Plaintiff alleges that Defendant violated the Americans with Disabilities Act ("ADA"), Section 107(a), 42 U.S.C. § 12117.  In count two of the amended complaint, Plaintiff alleges that Defendant violated the Florida Civil Rights Act ("FCRA"), Fla. Stat § 760.11. In count three of the amended complaint, Plaintiff alleges that Defendant violated Section 504 of the Rehabilitation Act of 1973 ("the Rehabilitation Act"), 29 U.S.C. § 794.[2]

On March 3, 2008, Defendant filed its answer and affirmative defenses to Plaintiff's amended compliant. (Doc. # 17).  Thereafter, on August 25, 2008, Plaintiff filed her

---

[2]  Since filing the present lawsuit, Plaintiff has accepted employment as a "teacher of four-year-old children" at Meadow Point Christian Academy, a preschool located in Pasco County, Florida. (Kaw Dep. Doc. # 34 at 5:17-25, 6:1-22).  Plaintiff's employment application for Meadow Point contains a "health" certification in which she answered "no" to the following inquiry: "Do you have any physical, mental, or medical impairments which would preclude you from performing certain kinds of work?" (Doc. # 41-2 at 1).

motion for partial summary judgment (Doc. # 22).  On October 31, 2008, Defendant filed its motion for summary judgment. (Doc. # 33).  Both motions are ripe for consideration by this Court.

## II.  **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)).  A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  The moving party bears the initial burden of showing

the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856 (11th Cir. 1988)). However, if the non-movant's response

consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required.  <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

Plaintiff seeks a partial summary judgment finding that Defendant violated the ADA and § 504 of the Rehabilitation Act.[3]  Thus, Plaintiff seeks a trial on damages only and an immediate injunction requiring Defendant to clear her record of any wrong doing and allow Plaintiff to reapply at the School District of Hillsborough County for other employment. In her motion, Plaintiff asserts that "there is no dispute" (1) that Plaintiff suffers from or is perceived to suffer from a disability; (2) that Plaintiff was terminated by Defendant because of her disability; (3) that Plaintiff did not pose a threat to anyone at the school; and (4) that Defendant's offer to re-hire Plaintiff was an unlawful ruse.

Defendant, on the other hand, seeks a summary judgment in its favor finding that Plaintiff is not disabled under the

---

[3] Plaintiff's motion for partial summary judgment does not discuss her FCRA claim; however, because Plaintiff's FCRA and ADA claims are analyzed under the same standards and analytical framework, this Court assumes that Plaintiff seeks summary judgment on her FCRA claim, in addition to her ADA and Rehabilitation Act claims.

ADA, FCRA, and Rehabilitation Act and that Defendant did not discriminate against Plaintiff due to a disability.

A.   **Burden Shifting Framework**

Plaintiff's ADA, Rehabilitation Act, and FCRA claims are all analyzed under the same standards.  Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000)("Discrimination claims under the Rehabilitation Act are governed by the same standards as used in ADA cases" and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice versa.").  Further, claims asserted under the FCRA are analyzed in the same manner as ADA and Rehabilitation Act claims.  Greenberg v. BellSouth Telecomm., Inc., 498 F.3d 1258, 1263-64 (11th Cir. 2007); Chanda v. Engelhard/ICC, 234 F.3d 1219, 1221 (11th Cir. 2000).

In this case, Plaintiff must establish a prima facie case of discrimination under the ADA by showing that: (1) she has a disability; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination because of her disability. See Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).  To show that she has a disability, Plaintiff must prove one of the following: (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or

(3) being "regarded as" having such an impairment. <u>See</u> 42 U.S.C. § 12102(2); <u>Carruthers v. BSA Adver., Inc.</u>, 357 F.3d 1213, 1215 (11th Cir. 2004). Under the third prong, if an employer perceives an individual as having a disability but there is no factual basis for one, then the individual is considered to be disabled for purposes of the ADA, as long as the perceived impairment would substantially limit a major life activity. <u>Carruthers</u>, 357 F.3d at 1216)(internal citations omitted).[4]

In ADA, Rehabilitation Act, and FCRA cases such as the present one, this Court utilizes the same burden shifting analysis as in Title VII employment discrimination cases. <u>Moses v. American Nonwovens, Inc.</u>, 97 F.3d 446, 447 (11th Cir. 1996). Once an employee establishes her prima facie case, the employer must present a legitimate, non-discriminatory reason for the adverse action that it took. <u>Wascura v. City of South Miami</u>, 257 F.3d 1238, 1242 (11th Cir. 2001). If the employer satisfies this obligation, the employee is then required to show that the employer's stated reason for adverse action was

---

[4] The ADA's definition of "disability" has recently been amended by The ADA Amendments Act of 2008, which went into effect on January 1, 2009. At this time, it is not necessary for this Court to determine whether the amendments to the ADA apply retroactively to the facts of this case.

pretextual.  Id.  That is, Plaintiff "has the opportunity to come forward with evidence, including the previously produced evidence establishing [her] prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."  Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997).

## B.    **Plaintiff's Alleged Disability**

Plaintiff contends that she is actually disabled under the first prong the ADA because her impairment, a condition known as vasovagal syncope, substantially limits the major life activity of working.  Specifically, Plaintiff argues that vasovagal syncope causes her to lose consciousness, that consciousness is a major life function, and that the loss of consciousness substantially limits her major life activity of working.

Plaintiff further submits that, even if this Court finds that she was not actually disabled due to vasovagal syncope, that Plaintiff is disabled under the third prong of the ADA because Defendant regarded her as having a disability.

Defendant, on the other hand, argues that Plaintiff's condition does not qualify as an actual disability because it does not substantially limit a major life activity and because

her symptoms are controlled by medication and are infrequent. Further, as to Plaintiff's allegation that Defendant regarded Plaintiff as having a disability, Defendant asserts that it has never in the past, nor does it now, regard Plaintiff as being disabled.

In support of Plaintiff's claim that she is actually disabled, Plaintiff relies upon several cases involving employees with loss of consciousness impairments. However, Plaintiff's cases are not helpful to her position. For instance, Plaintiff discusses <u>LaChance v. Duffy's Draft House</u>, 146 F.3d 832 (11th Cir. 1998), a case in which the Eleventh Circuit determined that a district court properly granted summary judgment in favor of the employer where the employee, who suffered from epilepsy, posed a direct threat to himself and others during the performance of his job duties.

In <u>LaChance</u>, the employee had a history of having a seizure at least once every two weeks, and he, in fact, had three seizures during the first two days of his employment as a line cook at a restaurant. <u>Id.</u> at 834. He went on leave for two weeks; however, when he planned to return to work, his employer informed him that he could not work at the restaurant because he was a "liability" to the restaurant. <u>Id.</u> The Eleventh Circuit did not directly state that the plaintiff's

seizure condition of epilepsy was a disability. The Eleventh Circuit reiterated that the plaintiff, as a line cook, was required to use boiling hot grease, gas top grills, slicing machines, and other cooking gear and that the plaintiff's "loss of consciousness was not only a danger to himself, but due to the working environment, was a danger to others as well." Id.

Plaintiff's vasovagal syncope causing her to faint twice during a one-year period cannot reasonably be compared with the employee's epilepsy in the LaChance case, in which the employee suffered from bi-weekly seizures.

Plaintiff also cites Sicilia v. UPS, 279 F. App'x 936 (11th Cir. 2008), a case in which the Eleventh Circuit affirmed the grant of summary judgment in favor of the employer when an employee with epilepsy filed suit under the FCRA. Id. at 937. The Eleventh Circuit determined that plaintiff was not disabled as follows: "Sicilia's epilepsy does not substantially limit a major life activity. By his own admission, his seizures are infrequent, not severe, and controlled with medication; he can tell when he is going to have a seizure and does not lose consciousness during one." Id. at 938.

Plaintiff's condition is comparable to the employee's condition in the Sicilia case, and the Eleventh Circuit properly determined that the Sicilia employee's condition did not constitute a disability.

Clearly, neither the LaChance case nor the Sicilia case lead to a finding that Plaintiff's vasovagal syncope is an actual disability.

This Court has evaluated Plaintiff's impairment of vasovagal syncope on an individualized and fact specific basis. Plaintiff's condition of vasovagal syncope caused her to faint two times during the 2005-2006 school year. This case is similar to Cadely v. New York Dep't of Transp., Case No. 04-cv-8196, 2008 U.S. Dist. LEXIS 15176 (S.D.N.Y. Feb. 13, 2008), a case involving an individual with vasovagal syncope who fainted on the job six times over a seven year period. The court determined that the plaintiff's condition was sporadic and not capable of substantially limiting a major life activity due to the infrequency of the fainting episodes.

This Court agrees with Defendant that, due to the infrequency of Plaintiff's fainting spells, and the effectiveness of Plaintiff's medications that controlled the fainting spells, that Plaintiff's condition did not substantially limit a major life activity, and therefore, it

is not a disability.  This determination is consistent with a number of ADA options issued by other courts facing similar factual scenarios. <u>See, e.g., Greer v. Sears, Roebuck & Co.</u>, 54 F.3d 776 (6th Cir. 1995)(plaintiff's vasovagal syncope did not substantially limit a major life activity); <u>EEOC v. Schneider Nat'l, Inc.</u>, 481 F.3d 507 (7th Cir. 2007)(plaintiff truck driver with vasovagal syncope was not disabled or regarding as disabled under the ADA); <u>Durham v. McDonalds Rest. of Okla., Inc.</u>, Case No. 07-cv-273-JHP-PJC, 2008 U.S. Dist. LEXIS 65362, at *3 (N.D. Okla. Aug. 22, 2008)("disorders such as syncope, that are well controlled by medication, do not qualify under the ADA as a disability because they do not effect a major life activity.")

However, there is a material issue of fact as to whether Plaintiff qualifies as having a disability under the third prong of the ADA due to Defendant regarding Plaintiff as having an impairment that limits a major life activity. Plaintiff supplied Defendant with numerous letters from her physicians regarding her condition of vasovagal syncope, and the limitations, if any, applicable to her work.  While working for Defendant, Plaintiff twice fainted and was taken away by ambulance, Plaintiff was frequently absent from work, and on one occasion, Plaintiff wore a heart monitor to a

meeting with Principal Smith, in which the heart monitor repeatedly sounded an alarm as to Plaintiff's heart. During his deposition, Principal Smith stated that he thought that Plaintiff might have a heart attack in his office during their September 18, 2006, meeting. (Smith Dep. Doc. # 38 at 32:20-22).

Furthermore, Trumbach offered testimony tending to show that he would not allow her to perform a wide range of jobs (basically any jobs involving the care and supervision of children) due to her "condition." (Trumbach Dep. Doc. # 39 at 14:15-25, 15:1-2).

Regardless of whether vasovagal syncope actually disables Plaintiff, the Court determines that a reasonable jury could find that Defendant's decision-makers (Principal Smith and Trumbach) regarded Plaintiff as having an impairment that limited Plaintiff's major life activities--particularly the major life activities of working and remaining conscious. Therefore, summary judgment is due to be denied on that ground.

### B. **Qualified Individual and Direct Threat**

The second hurdle that Plaintiff must clear is establishing that she was qualified to perform the essential functions of her employment. As stated by the court in <u>Earl</u>

v. Mervyns, Inc., 207 F.3d 1361, 1365 (11th Cir. 2000), "An individual is qualified if [she], with or without reasonable accommodations, can perform the essential functions and job requirements for the position the individual holds." "'Essential Functions' are the fundamental job duties of a position that an individual with a disability is actually required to perform." Id. (citing 29 C.F.R. § 1630.2(n)(2)(1)).

Defendant contends that Plaintiff could not perform the basic and fundamental duties of the position of one-on-one aide to B.V. As stated by Kenny and confirmed by Principal Smith, Plaintiff's sole job responsibility was the constant care and supervision of B.V. B.V. needed a one-on-one aide to remove sharp objects from B.V.'s reach and to make sure that he was safe. These duties could not be performed if Plaintiff was absent from work, nor could these duties be performed if Plaintiff was unconscious due to a fainting episode.

Plaintiff, on the other hand, submits that she was able to perform her duties, and points to Defendant's willingness to re-hire her as evidence that she was indeed a qualified individual. Plaintiff also points to the praise that she received from for colleagues as well as from B.V.'s mother

regarding her successful work with B.V. as evidence that she was qualified for the position of one-on-one aide to B.V.

A genuine issue of material fact exists regarding whether Plaintiff was a qualified individual. Therefore, a jury should weigh the testimony from both sides on this issue and determine whether Plaintiff was qualified for her position, especially in light of Defendant's offer to reinstate Plaintiff for her original position as aide to B.V.

Further, genuine factual disputes surround the issue of whether Plaintiff posed a direct threat to herself, B.V., or others. Plaintiff did in fact, faint two times while caring for B.V.; however, this Court is not certain if fainting infrequently can reasonably be deemed a direct threat in a school setting where other teachers and professionals are available to assist in the instance of a fainting spell. In addition, the fact remains that Plaintiff's fainting episodes that occurred at the school under Defendant's employ did not result in any harm to Plaintiff, B.V., or others. And, again, Defendant's position that Plaintiff posed a "direct threat" seems belied by Defendant's uncontested willingness to reinstate Plaintiff after her termination. A jury is best suited to determine whether Plaintiff was able to assist B.V. as a one-on-one aide in the manner required to be qualified

for her employment and whether she posed a threat to herself and to others.

### C.  **Discriminatory Action**

As to the third and final prima facie requirement that Plaintiff must demonstrate -- that she was discriminated against based upon her disability -- this Court must evaluate Defendant's contention that it fired Plaintiff due to absenteeism against Plaintiff's allegation that she was terminated based upon a perceived disability.

Plaintiff asserts that Principal Smith directed her to stay home from work until her medical testing was complete. Plaintiff further asserts that Principal Smith essentially procured her absence from work, and then used it as a pretextual excuse upon which to terminate her employment. Plaintiff also contends that Defendant's offer of reinstatement, conditioned upon her "good health," is evidence that she was originally terminated due to her medical condition of vasovagal syncope -- her perceived disability. Plaintiff also points to the testimony of Trumbach regarding her inability to perform based on her vasovagal syncope.

Defendant, on the other hand, clings to its contention that it terminated Plaintiff due to her absenteeism. Plaintiff agrees that absenteeism may have been one factor

leading to her termination, but she asserts that her disability was a motivating factor for her termination.

Because Defendant's motives for terminating Plaintiff are at issue, a jury should decide whether she was terminated lawfully or due to a disability in violation of the ADA, FCRA, and Rehabilitation Act.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Plaintiff's Motion for Partial Summary Judgment (Doc. # 22) is **DENIED.**

(2) Defendant's Motion for Summary Judgment (Doc. # 33) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>30th</u> day of January 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record