UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**SHERRIE KAW,**

       **Plaintiff,**

**vs.**                          **Case No.:  8:07-cv-02222-T-27TGW**

**SCHOOL DISTRICT OF
HILLSBOROUGH COUNTY,**

       **Defendant.**
_____/

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO RULE 50 OF THE FEDERAL RULES OF CIVIL PROCEDURE

At the close of the Plaintiff's case, the Defendant, The School Board of Hillsborough County, Florida, moved pursuant to Fed.R.Civ.P. 50(a) for judgment as a matter of law on the Plaintiff's claim for an unlawful termination in violation of the Americans with Disabilities Act (42 U.S.C. § 12111, *et seq.*)("ADA"), § 504 of Rehabilitation Act of 1973 (29 U.S.C. § 794)("504") and the Florida Civil Rights Act (§ 760.01, Florida Statutes)("FCRA").  The Court reserved ruling on that motion.  It was renewed at the end of trial and the Court again reserved ruling.  Following a verdict in favor of the Plaintiff, the Court granted leave to the Defendant to present written argument in support of the relief requested.  This memorandum is submitted pursuant to that leave.[1]

The Defendant's argument is based on, and will cite to, a presently incomplete

---

[1] Because the motion is being considered on the Court's reservation of ruling and not on a post-judgment renewal of that motion, the Defendant argues the motion as of the close of the Plaintiff's case-in-chief and does not present argument seeking a new trial.

record of the trial.  The original court reporter assigned to the case attended the first two days of trial but was absent for the last three.  The Defendant has obtained that portion of the transcript created by the substitute court reporter, consisting of the Defendant's case-in-chief and the Plaintiff's rebuttal case, and the transcript of the first day of trial. Missing is the transcribed testimony of the cross and subsequent examinations of the Plaintiff, and the testimony of Dr. Athena Valencia, Dr. Anne Curtis, Mr. Charles "Buddy" Raburn, and the Plaintiff's husband, Autar Kaw.

The original court reporter is not expected to return to work until October 22, 2009, at which time the Defendant will order the remainder of the trial transcript.  The Defendant submits its memorandum now in order that the Court's consideration of the motion prior to entry of judgment not be delayed further.  For the reasons described below, the Defendant's Rule 50 motion should be granted because as a matter of law the Plaintiff did not adduce evidence sufficient to allow a reasonable jury to find for her on the only issue which was presented to the jury for resolution, whether the Defendant's termination of the Plaintiff violated the ADA, § 504 or FCRA.

The standard to be applied to the Defendant's motion requires the Court to:

consider all the evidence in the light most favorable to the nonmoving party. If the facts and inferences point overwhelmingly in favor on one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted.  Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion [i]s due to be denied.

It bears repeating that a mere scintilla of evidence does not create a jury instruction.  Motions for judgment as a matter of law . . . need not be reserved for situations where there is a complete absence of facts to support a jury verdict. Rather, there must be a substantial conflict in evidence to support a jury question. Williamson v. Motorola, 303 F.3d 1284, 1289-1290 (11th Cir. 2002).

The only employment action of which the Plaintiff complained in this case was her termination.  She neither pled nor attempted to prove that she requested or was denied accommodation of her impairment.[2]  Neither did the Plaintiff bring any action based on the Defendant's refusal to reinstate her after her termination.  To the contrary, she pled and testified at trial to the fact that reinstatement was offered but she did not accept it because the offer was conditioned upon her "remaining in good health" and her health had in fact not changed.  Thus this case was and is based only on an allegedly wrongful termination based on an impairment that was not in fact a disability but was allegedly perceived as one.

Although the Plaintiff brought her single claim under the aegis of three different statutory schemes, the legal standard by which the claim is to be assessed is the same under all of these laws.  Cash v. Smith, 231 F.3d 1301, 1305 and n. 2 (11th Cir. 2001), Greenberg v. BellSouth Telecommunications, Inc., 498 F.3d 1219, 1258 (11th Cir. 2007).  In its order denying the parties' respective motions for summary judgment, the Court found that the Plaintiff's impairment, electrocardeogenic syncope (also referred to as vasovagal syncope), was in fact not a disability but that there were disputed issues of material fact which required resolution by a jury as to whether or not the Plaintiff was terminated on account of a perceived disability.  [Dkt. 51].

Under the law applicable to this case, it was therefore the Plaintiff's burden to

---

[2] To the contrary, in her amended complaint, Kaw alleged that after her first school-related syncopal episode, in September of 2005, Smith had been informed of her condition, perceived her as disabled and "as a reasonable accommodation, Principal Smith allowed her to sit in an empty classroom or teacher's lounge if she felt that she was near a point where she was fainting.  Additionally, Sherrie Kaw was allowed to take time off from work if she felt that it was necessary due to her medical disability."  Am. Comp. [Dkt. 14 ¶ 10].

show that she "(1) has an impairment which is not substantially limiting but which the employer perceives as substantially limiting impairment; (2) has an impairment which is substantially limiting only because of the attitudes of others toward such an impairment; or (3) has no impairment at all but is regarded as having a substantially limiting impairment." Deas v. River West, L.P., 152 F.3rd 471, 476 (5th Cir. 1998), citing Bridges v. City of Bossier, 92 F.3rd 329, 332 (5th Cir. 1996). It is undisputed, and the Court already has found in its order denying the parties' summary judgments, that the Plaintiff suffered from an impairment.[3] It was thus her burden to show that the Defendant regarded her as "having an 'impairment' *and* that this impairment, if it existed as perceived by [the Defendant], would have substantially limited one or more of [the[4] Plaintiff's] major life activities." Deas, at 476, emphasis in the original.

The state of the record at the close of the Plaintiff's case was such that the only proof of the Defendant's perceptions contained in that record must have come from the testimony of the Plaintiff herself or from Dr. Valencia. Dr. Curtis had no interaction with anyone associated with the Defendant and she spoke in this case only through notes which were authored under her supervisions by a doctor and a nurse practitioner which she supervised. Mr. Kaw testified only to the Plaintiff's deep attachment to her job and the impact of her termination. Mr. Raburn was called to testify about the applicability to the Plaintiff of a collective bargaining agreement between the Defendant and the Hillsborough Classroom Teachers Association, a labor organization representing certain

---

[3] The term "impairment" was defined in  29 C.F.R. § 1630.2(h)(1) as "any physiological disorder, or condition . . . affecting one or more of the following body systems: neurological, . . . cardiovascular . . . ;"
[4] The Plaintiff has made much of the direct threat defense raised by the Defendant.  That defense is not involved in the Defendant's motion made at the close of the Plaintiff's case.

employees of the Defendant.

The Plaintiff testified that she suffers from the impairment of electrocardeogenic syncope.  T-57.  Prior to the fall of 2005, this condition caused the Plaintiff to lose consciousness "just for no reason at all," as frequently as three times in one day.  T-57-58.  The Plaintiff "finally got control" of her condition after being seen by Dr. Curtis, a specialist in the field.  T-58-59.  Dr. Curtis took the Plaintiff off of medication which she previously had been prescribed.  Id.  She was also told that in order to prevent future syncopal episodes, when she felt lightheaded or dizzy, she "could sit, or you know, lie down or put my feet up for a few minutes until the feeling passed . . . [and also that she should] stay rehydrated and not get dehydrated."  T-59-60.

Ms. Kaw had worked for the Defendant School Board from 1999-2002, as a paraprofessional to an autistic child, leaving to have an operation.  T-61-62.  She applied to work for the Defendant again in 2005, at Benito Middle School, because her syncope was "not being an issue" and her children were of an age at which she did not feel needed as much.  T-61, 62.

The Plaintiff applied at Benito because her two daughters had matriculated there, she lived close by and she knew the principal, Bobby Smith.  T-64.  She asked Smith if he had any jobs and he replied that he had "some openings for paraprofessionals."  T-65.  Mr. Smith spoke with Mikki Kenny, who was the Exceptional Child Education ("ESE") Specialist.  Smith then "agreed that [she] would be hired . . . and asked me to meet with [Ms. Kenny] at a later date to go over the specifics of the job."  Id.  She was hired as one-on-one aide to a child with autistic spectrum disorder.  Id.  In her opinion, the

qualifications for that position were that she needed a willingness and desire to work with a child that has exceptional needs and a high school education, both of which she possessed. T-64-65.

Ms. Kaw was by all accounts successful in her duties, forming a strong bond with her student and the student's mother, Dr. Athena Valencia, with whom she spoke almost every day. T-66-67. During the 2005-2006 school year, Ms. Kaw also missed a great deal of work. The undisputed testimony was that, with but two exceptions, these absences were not caused by her syncope but rather her susceptibility to infections which she contracted at school. T-69. Additionally, Ms. Kaw took time off for travel with her husband. T-69-70. These absences "were always approved time [off]." T-69. For all of her absences, Ms. Kaw made sure that Mr. Smith and Dr. Valencia knew as soon as she was going to be absent because Dr. Valenica's nanny would cover for Kaw. Id.

In the 2005-2006 school year, Ms. Kaw suffered two syncopal episodes at the school site. The first occurred in the fall of 2005. She was walking down a hallway and when she regained consciousness she was in the hospital, having been transported there by the paramedics. T-72-73. Asked the question of what she did when she returned to school, Kaw answered:

A.      Many people were concerned and they were asking me if I was all right. I signed – at Benito when you walk in the door, there's a computer where you sign in under your Lawson (sic) number. And I'd sign in.

And, uh, they would ask me – Mary Farruggio, the secretary, Starla Rohl, the nurse who was at the front desk at the time, would ask – asked me if I was

okay.

I explained to them.  It's not life threatening. I'm fine.  Uh, it's just something I have to deal with.  Mr. Smith called me into his office.  I said the same thing to him.  All of [the child's] teachers expressed concern.

Q.    Why did you tell them about your condition?

A.    Well, I thought that they should know since it happened at school.  I was - - prior to that I was hoping that it wouldn't ever come up, but, you know, I wasn't trying to hide it.  I just, you know, decided that if it ever happened, I would tell them.  T-72-73.

Ms. Kaw suffered another episode of syncope in April of 2006.  She and her student walked to his class and she was standing in the back of the room and she passed out.  T-73-74.  The room was cleared of students and the paramedics were called again. T-74   Kaw was well-known to the paramedics because of the frequency of her having been treated by them during the chronic phases of her impairment.  T-74-75.   She regained consciousness while the paramedics were present at school.  Id.

Kaw received no discipline or counseling for her absences.  T-69-70.  In fact, notwithstanding her days away from school and the widespread knowledge of her condition and its link to her fainting to which she testified, the Plaintiff was rehired by Mr. Smith, to serve in the same capacity as a one-on-one aide, to the same child, for the 2006-2007 school year.  T-71.

In the first month of school of the 2006-2007 school year, Ms. Kaw was in the class of the same teacher in which she had fainted during the previous year when she "felt

kind of lightheaded and there was pressure in my chest."  T-76.  The teacher whose classroom they were in said to Ms. Kaw that she "didn't look too good" and that she would feel more comfortable if Kaw "would go to the nurse and just, you know, have her look at you."  Id.  Nurse Rohl took the Plaintiff's blood pressure and advised her to go home.  T-77.

    Q.     And then what happened?

    A.     I called my husband.  He came and got me.  And Starla stayed with me in the front office.  Mary Farrugio was there as well.  And **I** mentioned that I was going to call my doctor when I got home just to make sure everything was fine. Which I did.

    And I called the office at some point to let them know, you know, what - - what I did.  And they said come back to school after you see your doctor.  Id., emphasis added.[5]

Farrugio told Kaw that she would inform Mr. Smith.[6]  Kaw did indeed go home and called her physician, Dr. Curtis.  T-78-79.  Ms. Kaw saw Nurse Practitioner Rodriguez on September 6, 2006.  T-80.  Kaw testified that "because of the tightness in my chest and because of something [Rodriguez] heard . . . when she examined me that she would feel more comfortable if I had a 30-day event monitor placed on me."  T-79-

---

[5] In her amended complaint, Kaw pled that she called her husband to pick her up because "she does not drive her automobile when she is experiencing symptoms from her medical condition/perceived disability of Vasovagal Syncope."  [Dkt. 14 ¶ 11].

[6] In her deposition and in her response to the Defendant's motion for summary judgment, Kaw alleged that she was told to see a doctor by Smith or by "Mr. Smith through someone else" and when asked whether anyone had given her a directive not to come back to work until she had seen a doctor, she answered "They wanted a doctor's release."  That evidence was not offered at trial.  The Plaintiff did not identify anyone who mandated or even mentioned that she produce a doctor's note and she had never been required to provide such substantiation for any previous absence.  [Dkt. 47].

80.[7]  Rodriguez also gave Kaw a note saying she was unable to work until September 18,

2006, when Kaw was scheduled to see Dr. Curtis.  T-80.[8]

Kaw's purpose in contacting Curtis' office was "to let them know what was going

on with me and to, uh, have them suggest what I should do next and to let them know that

I needed to be seen to return to work."  T-83.  No one from Benito had told Kaw she

needed a note and she never had to produce one for any of her previous absences.  Dr.

Valencia testified, however, that she had advised Kaw to see a doctor in order to

determine her condition.

Ms. Kaw testified that she hand-delivered the note to Smith and he asked how

long she was going to have the monitor on and she told him.  T-86.  During Kaw's

absences in the 2006-2007 school year, which had included five days predating the events

of August 24, 2006, her duties were covered by an aide from a self-contained ESE

classroom.  T-87.  Kaw saw Curtis on September 18, 2006, at which time she claims that

she "wanted to go on a small dosage of medication, which was discussed at some other

time prior to that, uh, if it became necessary."  T-88.  This medication causes blood

pressure to rise and thereby prevents syncope, which is caused by a sudden drop in that

pressure.  Dr. Curtis' notes record no such communication but in any event no

prescription was given on September 18, 2006.  DX No. 36.  Dr. Curtis scheduled Kaw

for a tilt table test, to be conducted on October 3, 2006 and gave her a note authorizing

her to return to work.  T-88.  Kaw testified that she took this note to Benito and gave it to

---

[7] Dr. Curtis testified in the Plaintiff's case-in-chief that Kaw's feeling tightness in her chest was not associated with syncope.

[8] Curtis testified that she disagreed with both the decision to declare Kaw unable to work and to place the heart monitor on her.  Curtis' opinions in these regards were not communicated to the Defendant.

Smith.  T-89-90.  When she arrived at the school, she stood outside of Smith's door until he motioned her in.  T-90.  He asked her how everything was going and she gave him the note.  Id.  He asked if she had any other tests going on and then the heart monitor emitted a beep.  Id.  Smith asked what the noise was and she told him.  Id.  He asked if she needed to do "something with it."  Id.  She replied:

> I said, well, it kept me up all night.  It was going off.  And, you know, uh, it's probably nothing, but yeah, I'm supposed to transmit information through a land line.  He said, feel free to use my phone.  Pushed it towards me, so I did.
>
> And, uh, then [ESE Specialist] Kenny came in.  And I mentioned that I had a tilt table test scheduled for the 3rd of October.  And, uh, Mr. Smith said for, uh - - for the sake of continuity that it was better for me not to be coming and going.  That [the student] was working with this person that he had lunch with prior to my absence.  And, uh, that would continue until my tests were done.  And to come back after my tests were done.  T-90-91.

The monitor went off a second time during the meeting and Mr. Smith mentioned that it could be disruptive because she would have to leave the classroom to find a land line to transmit the information over the telephone and so it would be better for her to delay her return to work until the monitor had been removed.  T-92-93.  According to Kaw, she specifically told Smith that the tests would be completed by October 3, 2006.  T-93 ("And he said, all your tests will be completed by then, right?  And I said, yes.  And the tilt table test will be on the 3rd, that's correct.")

Ms. Kaw did in fact take the tilt table test on October 3, 2006.  That night, she

suffered a syncopal episode in which she lost consciousness.  T-95, DX No. 36, October 9, 2006).  Kaw testified that the episode was caused by the test she had just taken.  Id. Dr. Curtis testified that the test did not cause the fainting.  Kaw said she went to the hospital the next day because of the syncopal episode.  T-94.  Dr. Curtis testified and her notes reflect that Kaw went to the hospital because of chest pressure and shortness of breath.  DX No. 36, October 9, 2006.  Dr. Curtis testified again that these symptoms were not associated with syncope.

Kaw returned home from the hospital on October 6, 2009, to find a letter from Mr. Smith terminating her employment.  T-96, PX No. 5.[9]  The note informed Kaw that she was being terminated "because of concerns that you are not able to fulfill **the duties of the position for which you were hired**."  PX No. 5, emphasis added.  Kaw produced no evidence during her case-in-chief that even hints that Smith or any one else associated with the Defendant ever spoke of Kaw's ability to perform any job besides the single one for which she was hired.[10]

The first business day after the Plaintiff received word of her termination was October 9, 2006, on which day she was scheduled to see Dr. Curtis.  Dr. Curtis' fellow, a physician working under her supervision, gave Kaw a letter in which he wrote:

---

[9] In the amended complaint, Kaw pled that she received the letter on "October 7, 2006, a Saturday."  [Dkt. 14 ¶ 21].

[10] In support of her response to the Defendant's motion for summary judgment, Kaw submitted portions of the deposition of Joseph Trumbach, then a manager with the Defendant's Office of Professional Standards. [Dkt. 47]. That testimony, upon which the Court relied for its denial of the Defendant's motion was not submitted at trial.  Neither did Kaw testify, as she had in her deposition, that Trumbach's secretary, Barbara Bobolts, told her that Trumbach had said that Kaw's termination disqualified her from working in any position with the Defendant.  [Dkt. 51].

> Whom it May Concern
>
> Sherrie Kaw is a patient here with USF Cardiology.  She is undergoing treatment for a condition known as vasovagal syncope.  Although we cannot guarantee she will not pass out again, there is no medical reason she cannot continue to work as a teacher with minor precautions.  We would be happy to discuss the matter further over the phone if necessary.  PX No. 10

> Kaw testified that she took this note to Smith the same day it was written.  T-100.

In addition to being given the note, Kaw was placed on medication.  Id.  Following that prescription, Kaw did not have another fainting episode until March of 2008.  Id.  In addition to the letter which Kaw says she delivered to Smith on October 9, 2006, she submitted a notarized statement, which Dr. Valencia advised her to complete, promising that she would not hold the Defendant liable for any harm which occurred to her because of her condition.[11]  She also submitted a statement from her primary physician attesting to her ability to stoop, squat and bend and other documents as well.  The Plaintiff heard nothing from the Defendant and she filed charges with the United States Equal Opportunity Commission, the ACLU and "HIPAA."  On October 23, 2006, she informed the Defendant of her having done so.  PX No. 20.  Dr. Valencia also worked to have Kaw reinstated and in fact she was offered reemployment by letter signed by Mr. Smith dated November 10, 2006.  PX No. 30.  The letter provided as follows:

> Dear Mrs. Kaw:
>
> The Hillsborough County Public School District has accepted your physician's release to work.  It is always good to see an employee return to a state of good health.  With this release, you are being offered re-employment in your most recent position as a One-on-One ESE Aide at Benito Middle School.  You will be assigned to student [B.V.].  It is our hope that your good health continues to allow you to serve as a productive employee of our school district.  Should

---

[11] Although there was no testimony in this regard, an attempted waiver of workers compensation benefits is void as a matter of law.  § 440.21(2).

circumstances change, we will address them accordingly.

Ms. Kaw did not accept the offer based on advice she allegedly obtained from an investigator at the EEOC.  T-150.  She also testified as follows:

Q.     And did - - and did you ask - - did [Smith] ever tell you what he meant about should circumstances change, we'll address them accordingly?

A.     I mentioned to him that nothing had changed about my health.  It was the same.  T-147.

In fact, it is undisputed that Ms. Kaw's health had in fact changed.  On August 24, 2006, Ms. Kaw left work with tightness in her chest and feeling lightheaded.  The following Tuesday she sought treatment from an emergency room for the same reasons, from which she was admitted to the hospital until the 31st.  She saw a nurse practitioner on September 6, 2006 who, with or without a valid medical basis, declared Kaw unable to work until September 18, 2006 and fitted her with a heart monitor.  None of those actions was attributable to the syncope which Ms. Kaw testified the Defendant was already aware of.  She appeared at Benito on September 18, after having seen Dr. Curtis who, although she felt the monitor unnecessary, left it on for two more weeks.  The Plaintiff appeared at Benito on September 18, 2006, with the heart monitor on.[12]   The heart monitor's alarm went off twice.  Although the Plaintiff says that it was malfunctioning and in fact had to be replaced, there is no indication of that malfunction or of the device's having kept her up the previous night in Dr. Curtis' notes from an appointment that occurred on the same

---

[12] In her amended complaint, the Plaintiff pled that she went to Benito wearing the heart monitor not only on the 18th  but on the 7th of September as well.  ¶ 15.  In fact, she pled there that the malfunctioning occurred on the 7th.  [Dkt 14].

day as the meeting with Smith.  Ms. Kaw had a tilt table test on October 3, 2006.  She had a syncopal episode that night, in which she lost consciousness.  The next day, she went to the emergency room again, for chest pressure and was held for observation.  She saw Dr. Curtis on October 9, 2006, after the discharge and she was given medication which apparently caused a cessation of the syncopal episodes, until 2008.[13]  There was no evidence of any additional episodes of chest pressure or shortness of breath, neither of which were related to the syncope.  She very clearly was in better health as of the time that reinstatement was offered.  But as has already been noted, this case does not include a claim for a failure to reinstate.  It is only a claim complaining of a discharge.  Under the facts and law of this case, that discharge could be found unlawful only if a reasonable jury could find that a perceived disability was a substantial motivating factor for the employment action.  A reasonable jury could make that finding only if it could find that the Plaintiff's impairment was perceived as substantially limiting a major life activity.

In her case-in-chief, the Plaintiff did not attempt to identify the particular major life activity which she contended the Defendant perceived as having been substantially limited.  She did not provide that information in her response to the Defendant's motion for summary judgment. [Dkt. 47].   In her motion for partial summary judgment, in which she sought a ruling that she was either disabled in fact or perceived to be disabled, Kaw argued that the Defendant considered her to have a "condition which subjected her to fainting spells that would be sufficiently significant as to create a danger to herself and others by injuring herself or falling on a child."   Plt.'s Motion for Partial Summary

---

[13] Dr. Curtis noted in her March 5, 2007 notes that the improvement seemed to be produced by both the medication and her new employment in a less stressful job.  DX No. 36.

Judgment, [Dkt. 22, page 16].   Until trial, and then only after the charge conference which resulted in an instruction on the definition of work as a major life activity, the Plaintiff did not ever raise or argue that the major life activity which the Defendant fixated on in violation of the ADA was the ability to maintain consciousness.   But as a matter of law, the Defendant could not have acted on such a belief before Kaw's termination.   The Defendant relies heavily upon the October 12, 2006 note from Dr. Curtis' Fellow, in which that doctor, acting under Dr. Curtis' supervision wrote that Ms. Kaw suffered from vasovagal syncope and it could not be guaranteed that she would not faint.   To be sure, there was discussion of this note by Mr. Smith, Mr. Trumbach and others involved in the decision to reinstate the Plaintiff.   And although there ultimately was some dispute over when Smith got that note, be it on October 9, 12 or 13, 2006, it was undisputed that no one had that note at the time that Ms. Kaw was terminated.

It is also undisputed that as of the date of termination, no one – not Dr. Curtis, not Ms. Kaw herself, no one - - had determined that syncope was responsible for the condition that cause Kaw to leave work on August 24, 2006, or that fainting was involved with that departure.   According to the Plaintiff's testimony at trial, after the April, 2006 incident, she did not have another fainting episode at school.   T-76.   Therefore what happened on August 24, 2006 was not syncope.   Although Kaw did in the 2005-2006 school year have episodes where she "felt one of those presyncopal dizziness things . . . that she was able to resolve by going to the teacher's planning area [,just sit] for a few minutes, drink some water and then return to [her] responsibilities," none of these incidents occurred at school in the 2006-2007 school year.   T-76.   So it was not syncope.

What happened on August 24, 2006 was that she "felt kind of lightheaded and there was some pressure in my chest."  T-76.  Kaw did not testify that the teacher who told her she should see the nurse, the nurse herself or anyone else had any reason to believe that syncope was involved on that day.  And as already noted, Curtis testified that the chest pressure was not a symptom of syncope.

What followed, according to Ms Kaw herself, was that others besides Smith told her she should see a doctor.  Nothing in their statements indicated awareness of a syncopal episode having taken place and, of course since Ms. Kaw denies that it was such an event, there would be no reason for her to say it was.  She went home.  She says that she immediately called Curtis' office.  She says this happened on August 24, 2006.  Dr. Curtis' notes fix the date as August 29, 2006.  DX No. 36,  August 29, 2006.  According to the notes, Kaw reported that she had nausea and dizziness "with no passing out spells." Id.  Kaw was told to go to the emergency room if her symptoms became severe.  Id.  Two days later, Dr. Curtis called her office back after being informed of this call.  Id.  On that same day, August 31, 2006, Curtis' office called Kaw and the caller was told that Kaw had just been released from University Community Hospital, where she had gone for "nausea, vomiting and chest pain."  Id.

On September 6, 2006, Kaw saw Nurse Practitioner Cynthia Rodriguez, who worked in Dr. Curtis' office.  The Plaintiff gave Rodriguez a history of syncope but said she had no episodes "until a week ago."  DX No. 36, September 6, 2006.  She also advised Rodriguez of her chest discomfort radiating into her right arm with pain on the 29th.  Id.  Rodriguez fitted her with a 30 day loop monitor and advised her not to return to

work until she had seen Curtis.  Id.  The note which Rodriguez gave Kaw which she says she gave Smith did not say the cause of the absence.  Rodriguez gave no diagnosis, listing only the impressions of "a single syncopal episode" and "chest pain with emergency" room visit on the 28th.  Id.  Kaw provided no testimony that she told Smith or anyone else at the Defendant of any diagnosis.  There was in fact none.

On September 18, 2006, the Plaintiff saw Curtis and her Fellow.  On that day the Fellow/Dr. Curtis concluded that:

> The etiology of her symptoms is not clear.  We are pleased to hear that she has done better over the past year since she has discontinued all the medication she was on.  At this time we would like to evaluate her with a tilt table test at our facility to see if we can better determine what is going on. We will follow up on the remainder of her event monitor data (so far, transmissions do not reveal any abnormalities).  DX No. 36, September 18, 2006.

Importantly, Dr. Curtis added the following observation of Kaw on the 18th:

> I saw and evaluated the patient and agree with the assessment above.  The patient is doing better since many of her medications have been discontinued.  **While vasovagal syncope appears to be the most likely etiology of her syncope, we have never done our own tilt table test to see the actual pattern of the syncope.**  Id., emphasis added.

While Kaw testified that she went to Benito on September 18, 2006, and says she told Smith she was being tested, she did not testify that she told him she had suffered a syncopal episode.  The note which she says she gave Smith allowing her to go back to work did not say what she had.  It just said she could work without restrictions.  Indeed, as noted above, Curtis said she would not have put her out of work or given her the monitor.  Kaw says the monitor went off twice.  She quotes Smith as opining that it was distracting.  She did not dispute that assertion.

On October 9, 2009, Curtis notes that on October the 3rd, the night after the tilt

table test, she had another episode and the next day again suffered chest pains and shortness of breath. DX No. 36, October 9, 2009. She was started on medication and the treatment was successful. But of course, she had been terminated in the October 5, 2006 letter authored by Smith. Nothing that happened on the 9th could have affected that decision and as of the date the decision was made, Kaw had not told Smith why she was out or whether she had suffered a syncopal episode or had any condition at all. It was therefore impossible for him to consider her to be impaired.

What was clear is that the Plaintiff was not at work from August 24 until September 18, 2006. She says that she or Dr. Valencia told Smith that she was having tests. But she does not deny that she was absent and that she had no right to leave nor, according to her, had she asked for leave as an accommodation.[14]

At the close of the evidence in the Plaintiff's case-in-chief, the record contained the testimony of Charles Raburn who testified that as a temporary one-to-one aide, Ms. Kaw was not protected by the collective bargaining contract between the Hillsborough Classroom Teachers Association and the Defendant for a bargaining unit which included paraprofessionals. The Plaintiff attempted to impeach Raburn, with the apparent aim of showing that Ms. Kaw was covered by that agreement and therefore protected against termination except for cause. But viewing that evidence for the purpose of this motion in the light most favorable to the Plaintiff, the undisputed fact is that regardless of whether the Plaintiff was entitled to the protection of that contract, she was treated as if she was

---

[14] The Plaintiff had originally pled that she was denied FMLA leave, she withdrew that claim after it was pointed out to her that she had not worked enough hours to qualify for it. She admits that she was treated as having no annual or sick leave.

not and **all** temporary one-to-one aides were treated in that same manner, i.e., they were not given sick or annual leave and they could be terminated without cause at any time. The Plaintiff made no attempt to designate even a single comparator who was provided the contractual benefits which were treated at trial.

Even if the Court determines that Smith, for whatever reason, believed the Plaintiff to have syncope or "a condition which caused fainting," there is no evidence from which a reasonable jury could find she had met her burden. According to Kaw, Smith and the others knew that she had syncope in the 2005-2006 school year. It is undisputed that Smith knew of the two fainting episodes that occurred in that year. Kaw did not tell Smith that she would not faint again or that she was cured or that her condition was under control. And yet he hired her back for the same job the following year. There is no basis on which a reasonable jury could find that having brought Kaw back notwithstanding his knowledge of her loss of consciousness and/or her condition he would terminate her thereafter based on the same knowledge.

Proof of the employer's awareness of an impairment is insufficient to satisfy the burden of proof. Luna v. Walgreen Company, 575 F.Supp.2d 1326, 1338 (S.D. Fla. 2008). Rather the Plaintiff must show that she was regarded as substantially limited based on something other than fact:

> The problem is that [the plaintiff] has not provided any evidence, or *any* mention of, what myth, fear, stereotype, misperception, or belief fails the Supreme Court's [Sutton v. United Airlines, 527 U.S. 471 (1999)] test that it is necessary that an employer entertain misperceptions about the employee. Luna, at 1336.

In Sutton, which is controlling law in this pre-ADA amendment case, the Supreme Court instructed that an employer with a vision requirement did not by

19

enforcing that requirement regard applicants as substantially limited.

Moreover, the Plaintiff utterly failed to prove that the Defendant regarded her as substantially limited in performing a broad class of jobs.  All that was discussed with her were the duties of her particular position.  Barker v. R.T.G., 2009 WL 1767562, *6 (M.D.Fla. 2009).  In that case, the Court found that neither the employer's "expression of disgust" nor his recognition that the plaintiff might be entitled to accommodation constituted sufficient proof that the employer regarded the plaintiff to be substantially limited in a major life activity.  Id., *7.  And as the Court expressly noted:

> The Supreme Court has cautioned against recasting an inability to perform a specific job . . . as an inability to perform a "class" of tasks associated with that job.  Id, *7, citing to Toyota Motor Mfg., Ky., Inc. v. Williams,  534 U.S. 184, 201 (2002), superseded by statute, eff. Jan. 1, 2009 (2008).

In Lomastro v. Caddo Parish Sheriff, 2006 WL 1805875 (W.D.La. 2006), the court granted summary judgment to the employer in a case in which an applicant claimed discrimination based on a perceived disability because he was not hired for a job as a deputy based upon the employer's fear that the applicant had an increased chance of seizures.  The applicant's doctor's had deemed him medically able to perform the job "without restriction."  The Sheriff did not hire him and he sued.  The court held that the plaintiff was not regarded as disabled, only that he was not deemed suitable to perform as a corrections deputy.  Because this was a narrow band of jobs, the plaintiff could not prevail.

In Deas, Supra, 152 F.3d 471, summary judgment was affirmed against a plaintiff who had a history of epileptic seizures and was denied employment.  The court found that the employer's belief that the applicant could not perform as "an addiction technician"

did not equate to a perception of a disability.  152 F.3rd, at 481.  Collado v. United Parcel, 419 F.3d 1143 (11th Cir.) stands for the same proposition.

The Plaintiff survived summary judgment by the use of deposition testimony from herself and Joe Trumbach.  The Plaintiff testified that Trumbach's secretary, Barbara Bobolts, told her that because she had been fired by the School Board, Kaw could not be hired for another job.  Kaw did not repeat that testimony in her case-in-chief.  Indeed, even when Bobolts testified for the Defendant, the Plaintiff did not ask about that conversation.  In any event, the conversation was said to have occurred after the termination.  Trumbach was not called in the Plaintiff's direct case.  He was not asked the question when he was called by the Plaintiff in rebuttal.

The Plaintiff was maintained in her employment even after she fainted twice.  She was kept even after she missed several of the days in the first month of the 2006-2007 school year.  All that changed after that was there was no longer a nanny who could cover for Kaw and her many absences.  Under any reading of the record, she cannot prevail and the Defendant's motion must be granted.

## **CONCLUSION**

For the forgoing reasons, the Defendant asks that its Rule 50 motion be granted.

Respectfully submitted,

*/s/Thomas M. Gonzalez*
THOMAS M. GONZALEZ
Trial Counsel
Florida Bar No. 0192341
THOMPSON, SIZEMORE & GONZALEZ, P.A.
201 N. Franklin Street, Suite 1600

Tampa, Florida  33602
Telephone: (813) 273-0050
Facsimile:  (813) 273-0072
tgonzalez@tsg-law.com
ATTORNEY FOR DEFENDANT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of October, 2009, I electronically

filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will

send a notice of electronic filing to the following:

Matthew Dietz
Law Offices of Matthew Dietz
2990 S.W. 35th Avenue
Miami, Florida 33133


*/s/Thomas M. Gonzalez*
Attorney

22